NOT FOR PUBLICATION

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In the matter of | : | Case No. 05-60213/GMB |
| Miller Homes, LLC | : | |
| Debtor | : | |
| _____ | : | |
| Douglas S. Stanger, Chapter 7<br>Trustee for Miller Homes, LLC | : | Adversary No. 07-1212 |
| | : | |
| Plaintiff | : | |
| v. | : | |
| | | **OPINION** |
| George K. Miller, Jr., Esq. | : | |
| Defendant | : | |
| _____ | : | |

APPEARANCES:    Dean C. Waldt, Esq.
Mariah E. Murphy, Esq.
Ballard Spahr Andrews & Ingersoll, LLP
Plaza 1000, Suite 500, Main Street
Voorhees, New Jersey  08043-4636
Attorneys for George K. Miller, Jr.

Mitchell H. Kizner, Esq.
Douglas S. Stanger, Esq.
Flaster/Greenberg, P.C.
Commerce Center
1810 Chapel Avenue West
3rd Floor
Cherry Hill, New Jersey 08002-4609
Attorneys for Chapter 7 Trustee

**FILED**

JAMES J. WALDRON, CLERK

November 25, 2009

U.S. BANKRUPTCY COURT
CAMDEN, N.J.
BY: Theresa O'Brien,  Judicial
Assistant to Chief Judge Wizmur

In this adversary proceeding, the Chapter 7 trustee for the debtor Miller

Homes, LLC seeks to avoid a mortgage given to the defendant by the debtor

within one year before the filing of the debtor's bankruptcy petition.  The

trustee asserts that the transfer of the lien was a voidable preference under 11

U.S.C. § 547, and that the defendant was an insider of the debtor, making the

one-year period during which the transfer occurred applicable.[1]  On the

defendant's motion for summary judgment, additional counts of the complaint,

including fraudulent transfer, recharacterization of the loan as an equity

contribution, and equitable subordination, were dismissed, leaving only the

preference claim.  Because the defendant was neither a "person in control of

the debtor" under section 101(31)(B)(iii) nor a non-statutory insider, the

trustee's preference claim must fail.

## FACTS AND PROCEDURAL HISTORY

The defendant herein, George K. Miller, Jr., is an attorney in Atlantic

City, New Jersey.  Commencing in 2004, Mr. Miller began representing Miller

Homes, LLC, a real estate development company, and became acquainted with

its members Al Fawzy and Martin Miller.  There is no evidence of a familial

relationship between the defendant and Martin Miller, or between the

defendant and any member of Martin Miller's family.

---

[1]    This opinion borrows relevant portions of the opinion resolving the
summary judgment motion, but only to the extent that the facts were
presented at trial.

In July 2004, the defendant advanced $330,000 to the debtor in connection with one of the debtor's projects.[2] The particular project involved the purchase and development of certain property located in Egg Harbor Township, New Jersey, commonly known as the Reega Avenue Property (the "Property"). The debtor intended to acquire and improve the Property, to place mobile home units on the anticipated eleven improved lots, and to sell each improved lot and unit. At the time of the initial advance by the defendant, no documentation was executed between the parties memorializing the nature of the transaction. Al Fawzy testified that at the time of the advance, a verbal agreement was made between the defendant and Al Fawzy, on behalf of the debtor, that the defendant would lend a total of $562,000 to the debtor ($330,000 for improvements and $262,000 for the purchase of the land) in exchange for a mortgage on the property, 4% interest on the debt, and a 50% entitlement to profits on the sale of each lot. Fawzy testified that the reason the initial advance of $330,000 was made without documentation was that Fawzy had informed the defendant that the opportunity to develop the Reega Property would be lost if immediate action was not taken to make necessary improvements to the Property.

---

[2] The debtor was also developing a housing project of six to seven homes in Northfield, New Jersey, and had an interest in other lots in the South Jersey area.

On September 9, 2004, a "Joint Venture Agreement" was entered into between the debtor and the defendant.[3]  In its preamble, the Agreement provided that "the parties have become associated with each other as joint adventurers respecting the ownership of eleven (11) unimproved lots".  Trial Exh. D-1.  The Agreement noted that the Property was under contract to the debtor for a purchase price of $232,000, that the Property was to be titled in the name of the debtor, and that "the parties intend, nevertheless, to make continuing contributions of money and effort for the purpose of developing, maintaining and improving the lots for eventual construction and/or resale for profit and wish to protect and preserve their respective interests in the property."  Id.  In the body of the Agreement, the parties agreed that "the purpose of this Joint Venture is to have an investment in the aforementioned real estate." Id.  The parties agreed further that the purchase price for the property would be obtained "from a first mortgage loan provided by" the defendant.  Id.  The defendant agreed to provide $330,000 for the improvements of the lot.[4]  The Agreement further provided that at the time of closing, the $330,000 advanced for improvements "shall be consolidated into" the $232,000 purchase price "to create a first mortgage in the amount of five

---

[3]     The debtor was represented by independent counsel, who drafted the Joint Venture Agreement.

[4]     As noted above, at the time the Joint Venture Agreement was signed, the $330,000 had already been advanced by the defendant.

hundred sixty two thousand ($562,000.00) dollars." Id.  The borrowers on the

first mortgage were anticipated to be Al Fawzy, Miller Homes LLC and Martin

Miller.  They agreed to pay the defendant 4% interest on the entire amount

advanced.  The defendant was scheduled to be repaid principal and interest

upon the closing of the first seven lots.  Thereafter, "any profits remaining from

the sale of any part of the real estate shall be distributed in two (2) equal

shares, one (1) to George K. Miller, Jr. and one (1) to Miller [H]omes, LLC or its

designee." Id.  Further, the Agreement provided that the debtor agreed to

market and advertise the property and to utilize its resources "to expeditiously

complete the purpose and advancement of the within Joint Venture at no cost

to George K. Miller, Jr." Id.


The closing on the Property occurred on November 12, 2004.  On that

date, the defendant advanced an additional $232,000 to the debtor.  A

mortgage note was executed between the borrowers, listed as Miller Homes

LLC, Al Fawzy and Bruce Klein (apparently a new member of the debtor), and

the lender, listed as the defendant.  The principal loan amount of the note was

$562,000, and the interest rate on the note was 4%.  A mortgage was executed

in the defendant's favor in the amount of $562,000, and was recorded on

November 23, 2004.

The debtor filed a Chapter 11 case on November 2, 2005.  The case was converted to Chapter 7 on January 26, 2006, and Douglas Stanger, Esquire was appointed the Chapter 7 trustee on that date.  This adversary proceeding was filed on February 16, 2007.

## DISCUSSION

The trustee seeks to avoid as preferential, under 11 U.S.C. § 547, the mortgage that was executed by the debtor in favor of the defendant on November 12, 2004, and recorded on November 23, 2004.  The trustee's challenge extends at least insofar as the mortgage served to reconstitute the initial unsecured advance of $330,000 from the defendant to the debtor to secured status.[5]  Section 547(b) provides as follows:

(b)     Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
        (1)     to or for the benefit of a creditor;
        (2)     for or on account of an antecedent debt owed by the

---

[5]     As to the portion of the mortgage which collateralized the Note for $232,000, it appears that the preference exception set out in 11 U.S.C. § 547(c)(3) applies.  That section provides that a trustee may not avoid a transfer "that creates a security interest in property acquired by the debtor" if new value was given by the mortgagee at the time of the signing of the security agreement, which contains a description of the collateral, was given to enable the debtor to acquire the property, was in fact used by the debtor to acquire the property, and was perfected within twenty (20) days after the debtor received possession of the property.  11 U.S.C. § 547(c)(3) (West 2004).  These elements exist with respect to the $232,000 loan.

> debtor before such transfer was made;
> (3)   made while the debtor was insolvent;
> (4)   made—
> . . .
>   (B)   between ninety days and one year before the
>       date of the filing of the petition, if such creditor
>       at the time of such transfer was an insider; and
> (5)   that enables such creditor to receive more than such
>     creditor would receive if—
>   (A)   the case were a case under chapter 7 of this
>       title;
>   (B)   the transfer had not been made; and
>   (C)   such creditor received payment of such debt to
>       the extent provided by the provision of this title.

11 U.S.C. § 547(b).  With the exception of the "insider" issue under section

547(b)(4)(B), and the "insolvent" status of the debtor under section 547(b)(3),[6]

the parties agree that all of the elements of section 547(b) are met in this case:

(1) the defendant was a creditor by virtue of the initial loan of $330,000; (2) the

mortgage was made on account of an antecedent debt (the initial loan); (3) the

allegedly preferential transfer was made within the one-year prior to the

debtor's filing, and (4) the mortgage would give the defendant more in this

bankruptcy case than he would have had if the mortgage had not been

obtained and if he were treated as a general unsecured creditor.

The issue here is whether the defendant should be deemed an "insider."

---

[6]     The parties agreed that the issue of insolvency would be presented
if the defendant was determined to be an "insider" under section 547(b)(4)(B).

The determination of insider status under § 101(31) is a mixed question of law and fact.  In re Winstar Communs., Inc., 554 F.3d 382, 394 (3d Cir. 2009).  See also In re U.S. Medical, Inc., 531 F.3d 1272, 1275 (10th Cir. 2008) (although normally a question of fact, if the facts are undisputed and the issue turns on a legal conclusion based on those facts, it becomes a mixed question of fact and law with the law predominating); In re Florida Fund of Coral Gables, Ltd., 144 Fed.Appx. 72, 74 (11th Cir. 2005) (mixed question); In re Krehl, 86 F.3d 737, 742 (7th Cir. 1996) (same).  But see In re Fabricators, Inc., 926 F.2d 1458, 1466 (5th Cir. 1991) (insider status is a question of fact).

Section 101(31) of the Bankruptcy Code lists specific examples of entities who would qualify as insiders with respect to particular debtors.  For example, if the debtor is a corporation, the class of statutory insiders would include corporate directors, officers or other persons in control of the debtor.  If the debtor is a partnership, the insiders would include a general partner in or of the debtor and a person in control of the debtor.  These examples are illustrative of the statutory class of insiders.

In this case, the debtor is a New Jersey limited liability company.  A limited liability company is not separately provided for under section 101(31).  An LLC does, however, share many of the characteristics of a corporation.

-8-

"New Jersey enacted the Limited Liability Company Act ("N.J. Act") to enable members and managers of a Limited Liability Company 'to take advantage of both the limited liability afforded to shareholders and directors of corporations and the pass through tax advantages available to partnerships.'" D.R. Horton Inc. - New Jersey v. Dynastar Development, L.L.C., No. MER-L-1808-00, 2005 WL 1939778, *32 (Law Div. Aug. 10, 2005) (quoting Senate Commerce Committee Statement, S. 890 (June 14, 1993), republished at N.J.S.A. § 42:2B-1)).  As between treating the debtor as a corporation or a partnership for section 101(31)(B) purposes, it appears that section 101(31)(B) should control. The trustee does not contend otherwise.

If the debtor is categorized as a corporation, "insider" status includes:

(i) director of the debtor;

(ii) officer of the debtor;

(iii) person in control of the debtor;

(iv) partnership in which the debtor is a general partner;

(v) general partner of the debtor; or

(vi) relative of a general partner, director, officer, or person in control of the debtor.

11 U.S.C. § 101(31)(B).  In addition to the specific categories designated as encompassing "insider" status, "in light of Congress' use of the term 'includes'

in § 101(31), courts have identified a category of creditors, sometimes called 'non-statutory insiders,' who fall within the definition but outside of any of the enumerated categories." Winstar, 554 F.3d at 395.

To label the defendant as an insider, the trustee relies on one of two possibilities: that the defendant is a "person in control of the debtor," or that the defendant is a so-called "non-statutory insider," who falls within the definition but outside of any of the enumerated categories. To examine the application of these categories to the relationship between the debtor and the defendant, the factual record presented at trial by both the movant and the trustee will be scrutinized.

The defendant served as attorney for the debtor, commencing early in 2004, on particular litigation matters and land use needs. The record confirms that a close friendship developed between the defendant and Al Fawzy, the managing member of the debtor LLC, starting from their first meeting in January 2004. Fawzy became accustomed to seeking legal advice about all aspects of the debtor's operations from the defendant on a frequent basis. If Fawzy contemplated action regarding the Reega Property, he "made sure that George knew about it", because George "was involved in it."[7] When Fawzy

---

[7]     T80-15 to 16 (8/14/09).

approached the defendant to lend $330,000 to the debtor, Fawzy testified that

the friendship between the two men had grown to the point that the defendant

"did it absolutely for me",[8] and was willing to lend the money on a verbal

agreement before documentation could be completed.

Fawzy testified that in lending money to the debtor to acquire and

improve the Reega Property, the defendant did not take an interest in the

debtor itself, or in any other project or property owned by the debtor.  Nor did

the defendant agree to advance any further costs to the debtor in connection

with the project.  The defendant only had access to the books and records

provided to him, had no voting authority in the limited liability corporation,

and had no responsibility in connection with the debtor's business operations.

Fawzy consulted the defendant often because he felt that he lacked familiarity

with legal matters and tax-related issues, and wanted to exercise care in

conducting the business operations by routinely consulting with the debtor's

attorney.  Fawzy testified that he was the decision-maker for the debtor, that

he never felt obligated to heed the defendant's advice, and that he was never

coerced to do so.

To establish the defendant's "insider" status, the trustee offered two

---

[8]     T78-23 (8/14/09).

witnesses, including James Conover, whose construction company performed services for the debtor from early fall 2004 through 2005, and who negotiated with Al Fawzy in the summer of 2005 to take over Fawzy's membership in the LLC, and Tony Moore, the seller of the Reega Property to the debtor.

Conover testified that he met the defendant for the first time in January or February 2005, at least two months after the transfer in question occurred. He was introduced to the defendant by Martin Miller[9] as Miller's "best friend and business partner,"[10] but he did not know that the defendant served as the debtor's attorney.  Conover had no knowledge of the relationship between the defendant and the debtor in November 2004, and was not directly involved in the debtor's decision-making before June 2005.

Conover heard from Martin Miller that the defendant had to be kept "in the loop"[11] with any information regarding the Reega Property, and that the debtor had to gain the defendant's approval for "things of consequence."[12] Some time during the summer of 2005, Miller called the defendant his "off-the-

---

[9]     Martin Miller is now deceased.

[10]    T10-2 (8/14/09).

[11]    Id. at T23-22 to 23.

[12]    Id. at T24-19.

books partner."[13]  Conover observed that Fawzy consulted regularly by telephone with the defendant about the debtor's operations.  Several specific meetings involving the defendant occurring in 2005 were cited by Conover.  On one occasion, the defendant gave advice concerning the pavement of roads on the Reega Property, suggesting that the paving be done in stages to save money.  On another occasion, the defendant suggested the installation of a fence to block a retention basin and to reduce landscaping costs.  On a third occasion, Fawzy consulted the defendant about using a realtor on the project.  Lastly, Conover recalled seeing the defendant alone early one morning in the debtor's office, reading the newspaper.  Conover assumed that the defendant had a key to the office, and that he may be a "partner" in the debtor,[14] but he acknowledged that he really did not know the defendant's role.

Tony Moore was the owner of the company that sold the Reega Property to the debtor.  Moore met the defendant at the debtor's trailer before the sale of the Reega Property was consummated.  The defendant was introduced by Martin Miller as "one of the partners in the project."[15]  On that day, the defendant engaged with Moore and Miller in a lengthy discussion about the site

---

[13]     T23-12 (8/14/09).

[14]     Id. at T27-14 to 21.

[15]     Id. at T35-4 to 5.

development costs for the project.  On several other occasions, when Fawzy
and Moore were discussing the Reega Property, including such issues as
whether Moore would transfer to the debtor the benefits of the existing MUA
agreement after the sale, and whether Moore could retain two lots for his own
use, Fawzy called the defendant to consult.  Once, Moore heard Fawzy say to
the defendant: "he's [Moore] not agreeing to give us the MUA money so . . .
what do you want to do, George?"[16]  To Moore, Fawzy and Martin Miller were
"puppets", and the defendant was the "puppeteer."[17]

The picture that emerges is that the defendant served as the company's
attorney for many, if not all, purposes.  He developed a close relationship with
Al Fawzy and Marty Miller.  He determined to loan $562,000 to the debtor in
two parts, $330,000 in July 2004 for certain improvements, and $232,000 to
purchase the property on November 12, 2004.  The defendant received a
mortgage against the property in the amount of $562,000 on November 12,
2004, which was recorded on November 23, 2004.  The defendant was actively
interested in the conduct of the project, occasionally visited the property site
and the offices of the debtor, and offered advice regarding marketing and
construction concerns.  He had no independent access to the debtor's books

---

[16]    T51-14 to 15 (8/14/09).

[17]    Id. at T45-22.

-14-

and records, and had no obligation to participate in the liabilities of the debtor

beyond the loans that he advanced.  Nor did he have any operational duties, or

formal authority to take any action on the debtor's behalf.


      A.     Person in Control of the Debtor.


The trustee contends that the defendant qualifies as a "person in control

of the debtor" as provided for in section 101(31)(B)(iii).  Although this phrase is

not defined in the Code, the Third Circuit in <u>Winstar</u> determined "that actual

control (or its close equivalent) is necessary for a person or entity to constitute

an insider under § 101(31)'s 'person in control' language."  <u>In re Winstar</u>

<u>Communs., Inc.</u>, 554 F.3d 382, 396 (3d Cir. 2009).  "Actual control" has been

defined as "the ability of the creditor to 'unqualifiably dictate corporate policy

and the disposition of corporate assets,' <u>id</u>. (quotation omitted), or the 'legal

right or ability to exercise control over a corporate entity.'"  <u>In re U.S. Medical,</u>

<u>Inc.</u>, 531 F.3d 1272, 1279 (10th Cir. 2008) (quoting <u>In re Krehl</u>, 86 F.3d 737,

743 (7th Cir.1996)).  This determination requires

> an examination of the facts and particularly whether or not the
> facts indicate an opportunity to self-deal or exert more control over
> the Debtor's affairs than is available to other creditors.  Obviously
> actual management of the Debtor's affairs equals control.  Actual
> management means controlling such things as the Debtor's
> personnel or contract decisions, production schedules or accounts
> payable.

In re ABC Elec. Services, Inc., 190 B.R. 672, 675 (Bankr. M.D.Fla. 1995)

(citations omitted).  See also In re Grumman Olson Indus., Inc., 329 B.R. 411,

428 (Bankr. S.D.N.Y. 2005) ("The Bankruptcy Code's concern is whether a

person is able 'to exert influence over a debtor so as to gain a more favorable

position.'").

The plaintiff's proofs regarding the defendant's role in connection with

the debtor's business operations are insufficient to establish that the defendant

had "actual control" of the debtor's operations.  No showing was made that the

defendant had either the ability to unqualifiably dictate corporate policy and

the disposition of corporate assets, or the legal right or authority to exercise

control over the debtor.  All that was shown was that the defendant was

consulted frequently about the debtor's operations, seemingly for both legal

and business advice.  Such consultation does not equate with the ability to

dictate corporate policy, or with the legal right or authority to exercise control

over the debtor.  The Joint Venture Agreement between the debtor and the

defendant did not offer the defendant either individual or joint control of the

company, but simply memorialized the agreement of the parties that the

defendant would lend money to the debtor, the debt would be collateralized by

a first mortgage on the Property, and would be repaid in principal, interest and

a sharing of profits.  There is no showing that the defendant's actions in

providing advice to the principals of the company translated into active control
of the company.

Notwithstanding the unsubstantiated impression of Tony Moore that the
defendant was the "puppeteer" who controlled the debtor's business
operations, the trustee's contention that the defendant qualifies as a "person in
control of the debtor" under section 101(31)(B)(iii) must fail.

B.    Non-Statutory Insider.

The trustee alternatively contends that the defendant qualifies as a
"non-statutory insider" of the debtor.  In defining the term "insider", 11 U.S.C.
§ 101(31) places the word "includes" before a list of examples which signifies
that the definition of "insider" was not intended to be limiting or exclusive.
See, e.g., In re U.S. Medical, Inc., 531 F.3d 1272, 1276 (10th Cir. 2008) (quoting
language from In re Kunz, 489 F.3d 1072, 1078-79 (10th Cir. 2007)); In re Lull,
No. 06-00898, 2009 WL 3853210, *4 (Bankr. D.Haw. Nov. 17, 2009) ("Congress
intended an 'expansive view of the scope of the insider class, suggesting that
the statutory definition is not limiting and must be flexibly applied on a
case-by-case basis.'").  In other words, "'insider status may be based on a
professional or business relationship with the debtor, in addition to the Code's

per se classifications, where such relationship compels the conclusion that the

individual or entity has a relationship with the debtor, close enough to gain an

advantage attributable simply to affinity rather than to the course of dealings

between the parties.'" In re AFI Holding, Inc., 530 F.3d 832, 849 (9th Cir. 2008)

(quoting In re Friedman, 126 B.R. 63, 70 (9th Cir. BAP 1991)); In re Kunz, 489

F.3d at 1079 (quoting In re Enterprise Acquisition Partners, Inc., 319 B.R. 626,

631 (9th Cir. BAP 2004)).  See also In re U.S. Medical, Inc., 531 F.3d at 1276

("An 'insider' who does not fall within the plain language of 11 U.S.C. § 101(31)

but rather falls within the second category is a 'non-statutory insider.'").

"Thus, for example, a general partner or a relative is an insider per se, without

need for showing the specific nature of the relationship with the debtor in a

particular case.  A person or entity not made an insider per se can still be

treated as an insider on a showing that the person or entity in fact had a

relationship with the debtor that was sufficiently close that the two were not

dealing at arm's length." In re Kunz, 489 F.3d at 1079.  The courts generally

"conclude that it was the legislative intent that a person with a relationship

designated in the statute be treated as an insider because of the high potential

for control inherent in those relationships, and that other persons may be

found to be insiders in particular cases, based on the specific facts." Id.  This

is consistent with the legislative history, which describes an insider as "one

who has a sufficiently close relationship with the debtor that his conduct is

made subject to closer scrutiny than those dealing at arms length with the

debtor." H.R. Rep. No. 595, 95th Cong., 1st Sess. 312 (1977); S. Rep. No. 989,

95th Cong., 2d Sess. 25 (1978). See In re Krehl, 86 F.3d 737, 741-42 (7th Cir.

1996) (the legislative history supports consideration of "the closeness of the

relationship between the parties and [] whether any transactions between them

were conducted at arm's length").


    To determine whether the defendant qualifies as a non-statutory insider

requires consideration of both the nature of the relationship between the

parties and whether the transaction in question was conducted at arm's length.

See In re Lopresti, No. 03-48839, 2006 WL 2708605, *6 (Bankr. D.N.J. Sept.

20, 2006). "In determining the closeness of the relationship, courts have found

the essential question is 'the degree to which the transferee is able to exert

control or influence over the debtor.'" In re Hill, 342 B.R. 183, 199 (Bankr.

D.N.J. 2006) (quoting In re Dupuis, 265 B.R. 878, 885 (Bankr. N.D.Ohio

2001)). Although actual control does not have to be shown, In re Winstar

Communs., Inc., 554 F.3d 382, 396 (3d Cir. 2009), there must be something

more than "the mere existence of a friendship." Lopresti, 2006 WL 2708605 at

*7. See also In re U.S. Medical, Inc., 531 F.3d at 1278 ("more than mere

closeness is necessary for a court to hold that a creditor was a non-statutory

insider of a debtor"). "The case law that has developed [] indicates that not

-19-

every creditor-debtor relationship attended by a degree of personal interaction

between the parties rises to the level of an insider relationship." In re

Friedman, 126 B.R. 63, 70 (9th Cir. BAP 1991).

> A common basis for these rulings was the perception that,
> while a creditor may be in a strong bargaining position in dealing
> with the debtor, so long as the parties transact their business at
> arm's length, such circumstances do not necessarily give rise to
> insider status even though there was some degree of personal
> relationship with the debtor.  It is unlikely that Congress intended
> that complex business relationships existing over a period of time,
> attended by some personal involvement but without control by the
> creditor over the debtor's business, would subject such creditor to
> insider status.

Id.  See also In re U.S. Medical, Inc., 531 F.3d at 1277-78 (quoting Friedman).


Recently, in Windstar Communications, Inc., supra, the Third Circuit

reaffirmed the elements necessary to establish non-statutory insider status.

The court held "that it is not necessary that a non-statutory insider have actual

control; rather, the question 'is whether there is a close relationship [between

debtor and creditor] and . . . anything other than closeness to suggest that any

transactions were not conducted at arms length.'" 554 F.3d at 396-97 (quoting

In re U.S. Medical, Inc., 531 F.3d at 1277).  Applying the Windstar test here, I

can readily conclude that there was a close relationship between the debtor

and the defendant.  Fawzy's testimony regarding the defendant's willingness to

advance money to him, even without documentation, clearly supports that

conclusion.  The fact that Fawzy and Marty Miller consulted the defendant

frequently about all matters of consequence dealing with the debtor's affairs is

also noteworthy.  The defendant's status as attorney for the debtor no doubt

added to the closeness of the relationship, although courts have recognized

that "'[a]ttorneys are not automatically considered to be insiders under the

Code.'"  In re Premier Networks Servs., Inc., 333 B.R. 126, 129 (Bankr. N.D.

Tex. 2005) (quoting In re Lemanski, 56 B.R. 981, 983 (Bankr. W.D.Wis. 1986)).


The crux of the issue of defendant's status as a non-statutory insider is

whether there is anything in this record "'other than closeness to suggest that

any transactions were not conducted at arms length.'"  554 F.3d at 396-97.

The trustee contends that the transaction between the debtor and the

defendant was not conducted at arms length, particularly because the

defendant failed to abide by the Rules of Professional Conduct pertaining to

engaging in business transactions with a client.  RPC 1.8 proscribes business

transactions between a lawyer and a client unless the terms of the transaction

are fair and reasonable, the client is offered an opportunity to obtain

independent legal representation in writing, and the client provides written

informed consent.[18]  Here, although the debtor did retain independent counsel

---

[18]    Rule 1.8 (a) provides:

(a) A lawyer shall not enter into a business transaction with a

to draft the Joint Venture Agreement, the defendant failed to obtain written waivers of the conflict from the principals of the debtor.  The trustee asserts that the absence of a written waiver demonstrates that the situation was "inherently coercive", and that the requisite "arms length" nature of the transaction to avoid insider status is "virtually impossible" to establish.

The trustee's assertion is not supported by applicable case law.  In <u>In re U.S. Medical, Inc.</u>, 531 F.3d 1272, 1277, n.4 (10th Cir. 2008), the Tenth Circuit, quoting Black's Law Dictionary, defined an arm's length transaction as "a transaction in good faith in the ordinary course of business by parties with independent interest . . . [ that ] each acting in his or her own best interest, would carry out." <u>Id</u>. at 399.  In <u>Winstar</u>, the Third Circuit, citing to <u>U.S.</u>

---

client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:

(1) the transaction and terms in which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner that can be understood by the client;

(2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel of the client's choice concerning the transaction; and

(3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.

Medical, focused upon whether the alleged insider had the ability to coerce the debtor into transactions that were not in the debtor's best interest.  Id.  No such coercion is evident in the circumstances of this case.

Here, notwithstanding the close relationship between the defendant and the principals of the debtor, there is no evidentiary basis to establish that the lending transaction was not accomplished at arms length.  Fawzy, on behalf of the debtor, approached the defendant with the proposal.  The advancement of funds from the defendant enabled the debtor to acquire the Property and to make improvements on the Property, ultimately resulting in a substantial return to the bankruptcy estate.[19]  The terms of the transaction appear to be within the realm of reasonableness.  In any market environment, a 4% interest rate on a mortgage is not excessive.  The opportunity to tap into 50% of the profit achieved from the sale of each lot (but not the sale of the improvements on the lot) under these circumstances was not overreaching.  This is a simple transaction to loan money, to collateralize the debt, and to agree to repayment with interest and a share in the profits of the project.  Each party acted in its own independent interest.

_____

[19]    The secured debt due to the defendant is $562,000 plus 4% interest.  The Property was sold by the trustee for $900,000.

It has been said that "not every creditor-debtor relationship attended by a degree of personal interaction between the parties rises to the level of an insider relationship." In re Friedman, 126 B.R. at 70.  A similar circumstance was presented in Friedman, where a secured loan was made, the deed of trust was not recorded until five months later, and the bankruptcy filing occurred nine months after the recording.  The lenders were deemed non-insiders, even where they spoke by telephone with the debtor "in excess of a thousand times each year," Id. at 64, and had signatory rights on several of the debtor's bank accounts.  As in Friedman, the defendant was granted a recorded security interest in the debtor's property not because of his insider status vis-a-vis the debtor, but because he furnished consideration for the security interest within the context of an arms length agreement.

The trustee submits that the court should draw an adverse inference from the defendant's failure to testify at trial.  The trustee argues that the defendant's failure to testify signals that "his representation and business relationship were so entangled that the transaction between them could not be regarded as being at arm's length."  Plaintiff's Supp. Trial Brief at 4.  Indeed, the trustee is correct that a "missing witness" inference may arise where a party fails to call an available witness whose testimony could be expected to favor that party, because the natural inference is that the witness would have

exposed facts unfavorable to that party.  In re Groggel, 333 B.R. 261, 303

(Bankr. W.D. Pa. 2005).  However, drawing a missing witness inference is

inappropriate where the party who fails to call the witness has good reason to

believe that his opponent has failed to meet its burden of proof.  Id. at 304.

Here, there is no question that the burden of proof to establish insider status

rests with the plaintiff.[20]  I can conclude here that the defense had good reason

to believe that the plaintiff failed to meet his burden to establish the

defendant's insider status, producing a witness who did not even meet the

defendant until at least two months after the transfer in question, and another

witness who merely speculated about the nature of the relationship between

the defendant and the debtor based on several meetings and overheard

telephone calls.


        I conclude that the defendant is not an insider under the definition of

that term in section 101(31).  Accordingly, the transfer of a mortgage to him

outside of the 90 day period provided for in section 547(a) is not avoidable by

the trustee as a preference.  Defendant's counsel is requested to submit a form

of order in conformance with this opinion.

---

        [20]     Section 547(g) provides that "the trustee has the burden of proving
the avoidability of a transfer under subsection (b) of this section, and the
creditor or party in interest against whom recovery or avoidance is sought has
the burden of proving the nonavoidability of a transfer under subsection (c) of
this section."  11 U.S.C. § 547(g).

Dated:      November 25, 2009

JUDITH H. WIZMUR
CHIEF JUDGE
U.S. BANKRUPTCY COURT